Good morning. My name is Todd Bowley, and I represent the appellants, the defendants, Andrew Kopanen, who's here in the courtroom today, and Timothy Scarrot. We're here on an appeal from an order denying a motion for summary judgment based on qualified immunity. The doctrine of qualified immunity provides three successive layers of protection for police officers who find themselves in circumstances such as the defendants here. After the Supreme Court decision in Saussure v. Katz, the court must consider each layer of protection before concluding that a case can go forward to trial. In this case, the defendants are entitled to qualified immunity at each step of the analysis, and the court should therefore find that the officers are entitled to judgment. You know, there's a case, I forget the name now, which says that the doctrine protects everybody except the clearly incompetent. Now, are these folks clearly incompetent? Absolutely not, Your Honor. I think that in this situation, the officers were faced with a situation in which they come onto a scene where they do not know any of the players and they don't know what led to the provocation. All that they know is that they have seen somebody dressed as a civilian without provocation attack another person. Now, in this case, the defense is that they have seen somebody dressed as a civilian without provocation attack another person. Now, in this case, the defense is that they have seen somebody dressed as a civilian without provocation attack another person. In other words, there was evidence that, you know, things were said, things were done, which would which indicated that the that the victim was a police officer. Right. And the question is, well, should these officers have have perceived that?  I think that's a conclusion rather than a perception. And that's it. And I really want to see if I can explain my point on this. Okay. Because let's talk about what the facts are here, disputed and undisputed. Now, what are the undisputed facts? The undisputed facts are that the officers came on the scene. They saw a man dressed as a civilian without provocation assault another person. Well, they don't know about the provocation. That's not a. They didn't see anything that led to that. In other words, they. Happened before whatever had happened was before they arrived. They they see when they arrive on the scene, they see the smaller man retreating from a larger man. The larger man. When I say without provocation, they did not see any attack at any point by the smaller man of the larger man. They see the larger man kick and then punch the smaller man. The smaller man falls to the ground when a smaller man is on the ground and helpless. The larger man pulls out a gun and points it directly at his head. He turns to look at the police officers who are fully armed police car with light flashing and full police uniform. And instead of dropping the gun, instead of stepping back. And even though the man on the ground is completely helpless, he takes a move, makes a move in such a fashion as to lead the officers and the man on the ground to believe that the man is about to fire his weapon. Now, there's nobody who's watching that scene who says those facts didn't happen, that those things did not occur. The conclusion the officers drew from this is we're about to see a murder. Well, we're going for disputed and undisputed facts. So that's maybe disputed. But let's now see what facts were disputed. What's disputed is Officer Nash, who's some distance from the incident when the initial confrontation occurs. He doesn't see the initial confrontation. He's not in a position to see the assault. He drives up not knowing who's there. He observes Officer Wilkins, who he knows personally. Yeah, I said it was a cop. It's Willie. And he says that he didn't say it loud enough that he thinks that the other officers heard it. The other officers said we didn't hear it. Wouldn't that be an important disputed issue of fact? It's not disputed that the officers didn't hear it. The officers did not hear that statement. Now, that's got to be disputed, whether they're right or not. No, that's not disputed, Your Honor, in that nobody who was present heard neither Phillips on the ground, neither of the officers heard any statement along the lines of it's Willie or it's a police officer. What does Nash say about the ---- What he says is he said it in a very nonchalant way, and he has absolutely no way of knowing whether or not the officers heard what he said. But he didn't say he said it so softly that they didn't hear it. I mean, he obviously was trying to alert them to the fact. Was he not? No, he was not. He said that he was saying it in a nonchalant way, and he said he wasn't trying to alert them. Now, it's disputed as to what Willie himself said. Is that right? That is true, Your Honor, that the officers didn't hear any statement by Officer Wilkins. Mr. Phillips is the only person who says that he turned and said it's me, Willie. And he took his head off. He took his head off. What else? And he tried to show something. No. No. No, Your Honor. No, Your Honor. There was a badge hanging around the front of Officer Wilkins' body. Officer Nash says he thought he saw something that could have been a badge, but he also specifically says that the officers could not have seen it because Officer Wilkins' back was turned to the officers. Mr. Phillips, who had the closest contact with Officer Wilkins, never recognized him as a police officer. The officers never recognized him as a police officer because he never engaged in any actions that they saw that was consistent with him being a police officer. And that's the point that I'm making here, Your Honor, here, is that there are occurring events occurring. Now, when you say he did nothing consistent with being a police officer, wasn't, you know, what he had the other fellow do when he was spread eagle on the ground and pointed a gun at him, isn't that the classic felony arrest? Isn't that consistent with what a police officer would do in making a felony arrest? Well, it's consistent also with somebody shooting. Oh, no, no. Well, you say he did nothing consistent with what a police officer would do. Now, that's consistent with what a police officer would do, isn't it? I guess I would have to concede that if you accept that testimony, that that would be consistent with what a police officer is doing. But my point is that there are many other things they did which were inconsistent with what a police officer did. And so the issue is what conclusion do you draw? What did he do that was inconsistent with a police officer making a felony dangerous arrest? Officer Capone describes in his declaration what he observed Officer Wilkins doing. And his testimony goes through a number of items in which the actions were absolutely inconsistent with police training in terms of how you confront a high-risk suspect. What were they? Well, specifically kicking a suspect who does not appear to be armed, because that puts you in close proximity to the suspect. He throughout placed himself very close to the suspect, had his gun, in fact, very close to the suspect. That's something you're taught in the academy not to do because the suspect can get a hold of your weapon and then you're in big trouble. Have these two officers heard the broadcast? They had. And that's why they were there. They're there, yes. Now, didn't they mention that Phillips was wearing a red shirt and Escorat said that he had noticed the fact that the person on the ground had on a red shirt? I think that was the only – the red shirt was the only thing that was consistent with the description. The description was of a Hispanic wearing a red shirt. Mr. Phillips is an African-American. And so, therefore, both – both Officer Capone and Officer Escorat came to the conclusion that neither of these two gentlemen had anything to do with the incident that they came to the call about. Why isn't that a factual matter that should be determined? I mean, here's a guy on the ground wearing a red shirt. The broadcast said there was this – they're being sent there to assist this situation. And I see a man on the ground wearing a red shirt and another one with a gun. Well, there's no dispute as to the facts. And, again, the issue is what conclusion do you draw from those facts? The plaintiffs want to draw the conclusion that because there's a man of a different race wearing a red shirt who's on the ground, that, therefore, the man holding the gun on him must be a police officer. That's one – I mean, I suppose that's one after-the-fact explanation that you can come up with. The officers at the scene came up with another one, which is that they're – that these folks are not connected with the incident.   And I think that's the reason why, as a jury, we're going to decide that that – that – Why isn't that a jury question for – to decide whether that was reasonable or not? No. I think that at the first instance, the question is, on the Fourth Amendment, is whether or not the conclusion they reached was a reasonable one, not whether or not it was the only reasonable one. Well, that – Not whether or not it was even the most reasonable. I didn't say a thing. I said nothing about only. I said whether it was reasonable. Well, but if that is a reasonable question, it doesn't create a jury question on the issue of the Fourth Amendment. The Fourth Amendment says that an officer is entitled to summary judgment if the force used is objectively reasonable. That doesn't mean negligence. That means that the force chosen is one of the reasonable options which were available to the officer. The officer doesn't, under Scott v. Henrich, have to choose the least intrusive option. Counsel, how many shots were fired? A total of – well, each officer fired in range of five shots. There were nine shots. Pardon me? Nine shots? Well, I'd have to look at the record to see how many there were. Yeah. Does that trouble you a little? No, it doesn't, Your Honor. All the shots were fired in one free fall. And to say that – and let me talk a little bit about this. If there is a right to use deadly force, then how is it that you draw the line between you're entitled to use – to fire your weapon two times, but not three times? Three times, but not five times? You have to remember, we're talking about a human being here. But we have a line. We have a line someplace. Where is it? The line is if – and it's described, I think, in the Hopkins v. Zondaya case, where there's a gap in terms of the – between the initial need for force and then the later firing of the weapon. In other words, you had a situation in which the officer fired his weapon. There was a break in the action. The imminency of the threat had cleared. And so when the second round of shots were fired, there wasn't a need for the weapon to be fired. I mean, you have to remember here that we're talking about a human being who's making – Which one is the human being? The one that got shot or the one that's on the ground? Okay. They're all human beings, Your Honor. But the question is in measuring whether or not these human beings who we've given the responsibility of preventing crime have acted in a manner which is authorized by the Fourth Amendment. And in that circumstance, you have to ask if we are telling them you have the right, and in fact you have the duty to use deadly force to prevent a murder, and they see a circumstance under which it's reasonable for them to believe that that's what's happening. Was there any warning they gave? There's a dispute of fact as a matter of fact. Well, isn't that a really important dispute? No, it's not, Your Honor. As the district court noted below, this is the circumstance in which a warning was not feasible. And I think that the Frang v. Kachowski case did. In fact, it would have been very useful because Willie would have said, hey, I'm a policeman. Well, we know now if we go back, we can look over that circumstance and say with the benefit of hindsight, yeah, we can imagine a different event would have occurred. But in their belief, I mean, Officer Komponen was very clear. He was bracing himself. He believed that he was about to be splattered with the blood of the man who was on the ground. He believed that the firing of the weapon was imminent. And so that he waited. Was he that close that he would be splattered with the blood? He was with – I mean, it would be – it's in the record. There's a diagram of the scene. And I would be successful in memory. Well, what strikes me about that is that a quick statement or a quick warning, if he was that close to be splattered with the blood, would have something to do with the reasonableness. Unless you believed that if you waited an instant that he would fire his weapon. And that's what they believed. And it's very much like a Frane versus Kuchowski case, which you cited, in which there was even less imminence in that you had there a scene where the man holding the gun and the woman against whom the gun was being held, there was much less tension. Here, in addition to Officer Capone's testimony, we have Officer Scariff's testimony, that he saw the man move towards the man on the ground, straighten his arm. He believed that he was about to pull the trigger. I guess that's the question of whether that was reasonable or not. Pardon me? The question of them is whether that was reasonable or not. Well, there's no question that that's what he observed. And the issue is, was it a reasonable conclusion for him to draw under those circumstances that he needed to act imminently to prevent an unlawful shooting? All right. Mr. Paul, you've got about two and a half minutes. Do you want to reserve it for rebuttal? I would. Thank you very much. Good morning, Your Honors. Obviously, it's a highly factual case. And at this point, given the qualified immunity standard and the fact that this is a summary judgment motion where this issue was decided, the Court is required to consider the one thing. You say it's highly factual. But I think Mr. Boley is right. There are certain facts that are not disputed, including the fact of what these officers when I say these officers, I mean the two defendants, what they observed. Right? In other words, the scene that confronted them in which they had to make, I think, almost an instantaneous decision. I disagree, Your Honor. And I agree with the point you made at the very beginning of Mr. Boley's argument. It's disputed what these officers actually observed. We don't know what they actually observed. And as the Supreme Court instructed in the Reeves case on summary judgment, the Court is required to Well, how is it disputed? Maybe you don't like it, but I mean, how is it disputed? Well, because a jury could conclude that the officers who shot actually saw or heard things that they deny seeing or hearing. And that's what the Supreme Court instructs we're supposed to do at this point. Well, they don't deny seeing and hearing everything that other people say was in existence at the time. First of all. They deny having heard that Wilkins was a police officer or that it's Woolley. Yeah. They deny hearing those comments, right? That's right, Your Honor. And it's not, it's not credible. So we have to assume it's true. Well, we have to assume on this record that they didn't hear that. Well, if you just what I was trying to say, Your Honor, is that the Supreme Court directs that the Court is required to disbelieve all evidence favorable to the moving party that the jury is not required to conclude. And given the fact that there are two statements. No, no, no, no. Well, what the Court is required to do is to draw reasonable inferences in favor of the non-moving party. But it's not required to disbelieve uncontroverted testimony. That's what you're asking us to do, I think, to disbelieve uncontroverted testimony. Well, I'll just read the Court of what I'm relying on and try to make it more clear. It's from Reeves v. Sanders, 620 and 530 U.S. 133. And what the Supreme Court said is, thus, although the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. And that's what I'm talking about, Your Honor. Now, there's two statements that were made that I believe that the defendant officers could have heard or the jury could conclude. The first one being the statement by Officer Nash who said, it's Willie or it's a cop or he's a cop. And Officer Nash testified he was saying that because he wanted to tell these officers that that was a cop, and that's testimony in the record. That's the purpose for which he said it. He also said he was nonchalantly walking towards them. He was 30 feet away from Officer Wilkins when he made that statement. Officer Copeland says he was close enough to be spattered by the blood should the shooting take place. So that's about 30, 35 feet, maybe 40 feet away at the most. While the statement is being made by a police officer who says he wanted other officers to hear him, a jury could conclude that they, in fact, heard that and are denying it now. The other statement was Officer Wilkins turning, taking off his hood and saying, it's me, Willie. Now, the suspect being arrested testified in his deposition that Officer Wilkins said that loud. And again, at that point, Officer Copeland was, he says, close enough to be spattered by blood. But these, but these officers didn't know, didn't know Willie, right? That's correct. Well, so, so what does, you know, how does his saying, it's me, Willie, help? Well, because that's inconsistent with a suspect, a criminal suspect. That should have given them pause to think, you know, this is, this doesn't make sense. We're thinking this is going to be an execution. Why is this guy identifying himself verbally and physically, facially, and saying, it's me, Willie? Would reasonable officers have just blown him away at that point? I don't think so, Your Honor. And that's what Judge Chesney concluded as well. Reasonable officers would have taken the time to investigate a little bit more and at least have offered a warning, given the person a chance to show what he was really doing and what his motivations were. These officers saw a snapshot, the same snapshot that Officer Nash, the witness officer, saw. What they saw was this officer, a person pointing a gun at another person on the ground. That could be an execution. It could also be an officer undercover making an arrest, particularly given that these defendant officers were involved in a foot chase of a suspect. The guy on the ground was wearing the red shirt. There's a lot of facts suggesting that that, in fact, is the second scenario, the officer making the arrest. When you can't decide, you don't have enough facts at that moment to decide which is which, you need to take a little bit more time. At a minimum, offer a warning and give a few seconds for something to happen. Is there any showing about how these officers pulled up at the scene? Yes, Your Honor. What was that? The officers were involved in another important call involving a woman being threatened by a man with a gun who'd left the scene, two, three miles away. They hear radio traffic that there's a foot pursuit. They decide to leave that important call and go to the foot pursuit. They're directed by the dispatcher to go to a particular location. They don't go there because they say they're unhappy with the fact that they believe the suspect has already left from that point and they want to be in the action. So they disregard an order. They go to where they find these two individuals, and that's where they go improperly. They pull their car up, and at the same moment on each end of the street are these two other witness officers, Officer Nash on one end and Officer McClure on the other end. And the two defendant officers pull into the middle of the street right where they see these two individuals. There was some... And that was, I gather, a marked car. It was a marked car, yes. And so these two officers get out of their marked car and are there at the scene, and Wilkins saw them, I gather. Apparently he did. Because he said pulled off the hood, is that right? Yeah. You can infer that Officer Wilkins saw them from the fact that he did pull off the hood and turn and say something. So the worry would have been that Wilkins would have gone ahead and shot the guy on the ground right in front of the police officers? That's what the defendants say was their fear. Officer McClure saw the defendant's car pull up. Officer McClure says they were only there 5 to 10 seconds before the first shot ran out, rang out. 5 to 10 seconds. And nobody... There's disputed testimony about any warning was given. What the testimony shows in the light most favorable to the plaintiff is that the only statement by the two defendant police officers was Officer Kopanen saying, he's got a gun, that's it. One statement, he's got a gun. They both begin shooting. Nothing else was said by the defendant officers. And reasonable police officers clearly would have done something differently and would have said some different things. There's some facts that were represented as undisputed that are not undisputed, and I just want to make that clear, Your Honor. First of all, Officer Kopanen claimed that Officer Wilkins made a move, some move, which caused him to decide that he had to pull the trigger at that moment. Because he admits that for a few seconds he was witnessing the scene and he didn't pull the trigger. But then when he says Officer Wilkins made a move, he had to pull the trigger. He wasn't able to describe what the move was. He wasn't able to describe it at all. He just said it seemed like a move. He couldn't say if it was his arm, his body, his head. And that, Your Honors, is not an objective basis for which to decide to shoot. And there's a recent case from this Court called Haugen. And in the Court, in that opinion, the Court repeatedly said that the police officer did not have an objective basis for her subjective feelings that she had to use deadly force. And that's what we're dealing with here, too. They can't articulate a physical movement that Officer Wilkins supposedly did. The other thing is, is that Officer Skerritt says the reason he decided to shoot was because he had given all these warnings and commands to drop the gun that Officer Wilkins disregarded. But, again, the testimony in favor of the plaintiff is that there were no such warnings given. And then it seems that the defendants want to have it both ways because they also want to say, well, a warning wasn't feasible. There was no time to give a warning. But that is not credible because Officer Skerritt claims he gave a warning, even though other people say he didn't. So they should not be in a position to say a warning was not possible. There were 13 shots fired. Officer McClure began looking the moment the first shot was fired, and he saw the whole scene from that point on. And what he witnessed was no gun in Willie Wilkins' hands. He's backing up about 15 feet as he's being shot. And he finally falls to the ground, empty hands the whole way. It took five seconds to fire those 13 shots. That's according to Officer McClure. According to Officer Skerritt, one of the defendants, he says it took three to four seconds to fire those shots. And every gunshot is a use of deadly force, requiring an independent assessment of the threat. And Judge Fletcher asked, well, how do we draw the line? And I would say the line should be drawn by, is there a continuing threat requiring another pull of the trigger? And in some circumstances, a person can be charging at an officer with a weapon, and the officer is entirely justified in continuing to pull that trigger until that threat stops. But here, when Officer Wilkins dropped his gun right away, there was no justification for the continued shots. If anything, after the first shot, when they saw Officer Wilkins was backing up with his hands empty, they should have stopped right then. And that's what reasonable officers would have done. Kennedy. Well, but that argument goes to the ultimate liability. It doesn't go to the qualified immunity, does it? Well, it's interesting because those two questions are really intertwined. And as this Court recently remarked, the first step in the qualified immunity analysis is instructive for deciding the second step. And that's in the Mena case that we cited in a letter to the Court because it was just recently cited, Mena v. Simi Valley, 332 F. 3rd, 1255. And that's simply articulating the analysis that I believe this Court has used in deciding qualified immunity since the Salsier case, like in the Dioral and the Headwaters case. The Court, as I read these cases, goes through the first step, which is the plaintiff's right violated. And then in looking at the second step of the Salsier analysis, where the burden shifts to the defendant, the Court goes over those facts again and decides, well, was that clearly established? Is it clear enough that reasonable officers would have known at the time? And that's what we're talking about. And it's an unusual situation here where we have two other reasonable officers on the scene, both who testified to what they perceived of this same incident, and especially Officer Nash, who was 30 feet away or so during this whole thing and had a similar vantage point to the two defendants. He says from what he saw, no reasonable officer could have mistaken the fact that Officer Wilkins was a police officer making an arrest because it was a textbook technique that they teach in the police academy where these two defendants had recently graduated.     Officer Nash, who was 30 feet away or so during this whole thing and had a similar vantage point to the two defendants. When he dropped his gun, was there a dispute about when he dropped the gun and when he was backing up, or is that undisputed? I'm not aware. I've never heard any dispute from the defendants. Here's the evidence that we base this assertion on. Officer McClure says that's what he saw, first of all, that after the first shot, he immediately looked there and there was no gun in Officer Wilkins' hands and he saw Officer Wilkins backing up empty-handed. We also know that Officer Wilkins started right near the suspect on the ground and his body was found about 15 feet away from the suspect. However, Officer Wilkins' gun was still laying right near the suspect. So that's physical evidence that also confirms that Officer Wilkins dropped his gun at the very beginning. This is not just about what these officers should have done in the five or ten seconds in which they were out of the car. It's what reasonable officers would have done. That's the issue for both the underlying Fourth Amendment claim and for qualified immunity, Your Honors. And so we need to consider what would reasonable officers have perceived that these officers say they didn't perceive, and what would reasonable officers have investigated? What else, what other information would they have allowed themselves to take in or would they have looked for? And the Curley v. Clem case out of the Third Circuit, which we cited, I think, is instructive here, because in that case, it was another friendly fire shooting where a police officer was killed, and the Third Circuit held that one of the reasons for denying qualified immunity to the defendant in that case was that he failed to take the time to assess more facts, to try to investigate and figure out what was really going on. Because in police work, you may see another officer with a gun, and you can't just assume it's the worst-case scenario of a person about to shoot another person. Officers are trained, and reasonable officers would take the time to figure out what's really happening. I'd be happy to answer any more questions that you might have. Thank you. No? All right. Thank you, Mr. Dodd. Rubato, Mr. Bowley. Thank you. I wanted to clarify just a few misstatements. There the officers did not disregard the order. They went to, if you look at the declarations of the officers, if you look at the transcript of the radio transmission, they responded to a call for officers to come and assist with setting up a perimeter. They went to the intersection that they were directed to go to. When they arrived at the intersection, they noticed this confrontation in the middle of the block. That's what drew them to the middle of the block. The officers, McClure and Nash, did not see the same snapshot. That's what the district court found, that the officers, Coppola and Skarrett, were looking at a completely different scene and had completely different information, and then especially Officer Nash. Counsel has described – I'm sorry. I didn't quite understand that. You say Officer McClure and Nash had a conflicting – They had a completely different perspective. Officer McClure wasn't even looking at the scene until he heard the shots being fired. Officer Nash was some distance away when the incident began, and he viewed it from a completely different angle. And he also knew it was Officer Wilkins because he had seen Officer Wilkins a few hours before. Counsel has described the Fourth Amendment issue and the qualified immunity issue as being intertwined. And this court has clearly said over and over again, as did Saucier v. Katz, that they're two separate analyses that cannot be conjoined. In this case, the officers were forced to act in haste and in a heartbeat to make a life-and-death decision. If they failed to perceive the incident in the same way as others would have, their mistake was a reasonable one, given the extreme emergency they faced. If they were mistaken about the need to use force – remember, Billington v. Smith says that you're entitled to qualified immunity in a proper case, even where you use force which is objectively unreasonable. And if they were mistaken about the need to use force, it was also reasonable because they believed that if they delayed even for an instant, they would have permitted a murder to take place. This is exactly the circumstance for which qualified immunity is designed. The court should reverse the district court and direct the court to enter judgment for the officers. Thank you. Okay. Thank you, Mr. Boley. Thank you, Mr. Haddad. This case is submitted for decision. Last case on today's calendar, so we'll stand in recess for the day. Thank you.
judges: Hug, B. Fletcher, Tashima